**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHELLE PEARL,                          CASE NO. 2:18-cv-12713
                                         DISTRICT JUDGE DAVID M. LAWSON
          *Plaintiff*,                   MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL
SECURITY,

          *Defendant*.
_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 11, 12)

## I. RECOMMENDATION

Plaintiff Michelle Pearl appeals the Commissioner's final decision denying her disability benefits. For the reasons that follow, I conclude that substantial evidence supports the Commissioner's decision. Therefore, I recommend **DENYING** Plaintiff's Motion, (R. 11), **GRANTING** the Commissioner's Motion, (R. 12), and **AFFIRMING** the Commissioner's decision.

## II. REPORT

### A. Introduction and Procedural History[1]

Plaintiff applied for Supplemental Security Income (SSI) in April 2014, alleging she

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to me for review. (R. 2.)

became disabled on June 1, 2012. (R. 7, PageID.289.)[2] The Commissioner denied the claim. (*Id.*, PageID.163.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (*Id.*, PageID.202), which occurred on October 23, 2015. (*Id.*, PageID.91-114.) The ALJ issued a decision on March 1, 2016, finding Plaintiff was not disabled during the relevant period. (*Id.*, PageID.180-90.)

On May 15, 2017, the Appeals Council remanded the case to the ALJ because (1) the ALJ had received evidence that was never given to Plaintiff, and (2) the ALJ's decision failed to consider the possible binding effect of a 2011 ALJ decision rendered on one of Plaintiff's earlier applications for benefits. (*Id.*, PageID.195.) The Council required the ALJ to allow Plaintiff to review and comment on the new evidence and to explain whether the prior decision's findings were binding. (*Id.*, PageID.196.)

On remand, the ALJ held another hearing, (*id.*, PageID.115-42), and in a November 2017 decision, again denied benefits, (*Id.*, PageID.51-63.) This time, the Appeals Council denied review of the ALJ's determination,[3] which then became the Commissioner's final decision. (*Id.*, PageID.33-36.) Shortly after, Plaintiff sought judicial review of the decision.

---

[2] The only application in the record says that Plaintiff applied on June 24, 2014. (R. 7, PageID.289.) But both the initial determination form denying benefits and the ALJ's decision give April 29, 2014, as the application date. (R. 7, PageID.54, 163.) Both parties' briefs cite that same date. (R. 11, PageID.698; R. 12, PageID.718.) Neither party has stumbled upon this discrepancy and I cannot see how the differing dates affect the outcome here. Therefore, I use the date the parties have settled on.

[3] Plaintiff submitted evidence to the Council that was not presented to the ALJ. (*Id.*, PageID.34, 40-42.) In the Sixth Circuit, when the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the final decision of the Commissioner, 42 U.S.C. § 405(g), and the final decision is the ALJ's when the Council denies review, 20 C.F.R. § 416.1455, the court can consider only evidence presented to the ALJ.

(R. 1.) She then filed the instant Motion for Summary Judgment on February 5, 2019, (R. 11), and the Commissioner countered with its own Motion later in the month. (R. 12.) The case is now ready for resolution.

### B.  Framework for Disability Determinations

SSI is available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## C. ALJ Findings

Following the sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 7, PageID.63.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (*Id.*, PageID.54; *see also id.*,

PageID.182 (finding the same for the 2016 decision on Plaintiff's current application prior to the Appeals Council's remand); *id.*, PageID.149 (finding the same for the 2011 decision on Plaintiff's earlier application for benefits).) At step two, the ALJ concluded that Plaintiff had the following severe impairments:

> closed head injury, neck and back disorder, migraine headaches, degenerative joint disease of the wrist and knees and depression; status post surgery of right ureteral stricture, severe cervical sprain with radiculopathy, severe lumbar sprain with radiculopathy, thoracic radiculitis, anxiety, restless leg syndrome, and joint pain in hands bilaterally.

(*Id.*)[4] At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*, PageID.54; *see also id.*, PageID.183 (same conclusion in 2016 decision); *id.*, PageID.149 (same conclusion in 2011 decision).)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> light work as defined in 20 CFR 416.967(b)[5] except the claimant [c]an

---

[4] The ALJ's first decision on Plaintiff's current application—the 2016 decision—found fewer impairments: "[i]nternal derangement disorder of the right knee, cervical, thoracic and lumbar radiculitis, migraine headaches, depressive disorder and anxiety disorder . . . ." (*Id.*, PageID.182.) The decision on the prior application—the 2011 decision—listed the following severe impairments: "closed head injury, neck and back disorder, migraine headaches, degenerative joint disease of the wrist and knees and depression." (*Id.*, PageID.149.)

[5] The regulation defines this work level as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

frequently reach in all directions bilaterally; frequently handle, finger, and feel bilaterally; frequently push and pull bilaterally; frequently use foot controls bilaterally; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no exposure to unprotected heights and moving mechanical parts; avoid concentrated exposure to vibrations, humidity, wetness, extreme cold, and extreme heat; avoid concentrated exposure to fumes, odors, dusts, and pulmonary irritants; limited to simple, routine, and repetitive tasks, but not at a production rate pace; use judgment in the workplace limited to simple work related decisions; deal with changes in the work setting limited to simple work related decisions; and sit-stand option permitting change in position if needed and without disturbing the workplace.

(*Id.*, PageID.56.)[6] At step four, the ALJ found that Plaintiff could not perform her past

---

[6] This RFC differed from the 2016 decision's:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except: The claimant can perform simple, routine, repetitive work at a specific vocational preparation of 1 or 2. She can have occasional contact with supervisors, coworkers and the public. She can lift and carry five pounds frequently and 15 pounds occasionally, sit for six hours, with normal breaks, in an eight-hour workday and stand and/or walk two hours, with normal breaks, in an eight-hour workday. She can perform pushing and pulling motions with her upper and lower extremities within the aforementioned weight restrictions. She can perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching on a frequent basis. She should avoid unprotected heights and concentrated vibrations. She can occasionally climb stairs and ramps, stoop, balance, kneel, crouch, and crawl and she should avoid climbing ladders, ropes, and scaffolds.

(*Id.*, PageID.185.) The 2011 decision's RFC was as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR . . . 416.967(a) except the claimant must be permitted to have a sit/stand option allowing the claimant to sit or stand at will provided that she is not off task by more than 10%; can never climb ladders, ropes or scaffolds; can only occasionally stoop, crouch, kneel, crawl and climb ramps and stairs; can only occasionally engage in overhead reaching with the right upper extremity; cannot engage in repetitive rotation, flexion or extension of the neck; can frequently engage in gross and fine manipulation with the right upper extremity; must avoid all exposure to excessive vibration, hazardous machinery and unprotected heights; is limited to performing simple (defined in the DOT as SVP levels 1 and 2), routine, and repetitive tasks. She is also limited to low stress jobs with only occasional decision making and changes in the work setting with no strict production quotas with an emphasis on per shift rather than a per hour basis.

(*Id.*, PageID.151.) A sedentary work level

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as

relevant work. (*Id.*, PageID.61; *see also id.*, PageID.188 (2016 decision finding Plaintiff unable to perform past work); *id.*, PageID.157 (same for the 2011 decision).) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.*, PageID.62; *see also id.*, PageID.189 (2016 decision finding Plaintiff able to perform a sufficient number of jobs of the national economy); *id.*, PageID.1157-58 (same for the 2011 decision).)

### D.  Administrative Record

#### 1.  Medical Evidence

The earliest medical report in the administrative record comes from 2005. (R. 7, PageID.498-514.) In January of that year, Plaintiff hit her head during an automobile accident. (*Id.*, PageID.498.) She subsequently sought treatment for headaches, dizziness, memory and concentration problems, right arm pain and numbness, and "[b]elat[ed] leg pain." (*Id.*) The records come from a neurology office, and the last page of the entire group of documents (spanning multiple dates) is signed by Dr. Haranath Policherla, a neurologist, although no earlier pages bear any signatures. (*Id.*, PageID.514.) At an evaluation that month, various tests produced "positive" results, which in this context appears to mean she experienced pain or limitations during a foraminal compression test, shoulder depression test, straight leg raising test, Laseque's test, Braggard's test (only on right side), Beachterew's test (only on right), and Milgram's test. (*Id.*, PageID.498.) Her cervical

---

one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

spine's range of motion was less than full by all measures, but her shoulder and hip ranges of motion were almost entirely normal. (*Id.*, PageID.500.) Moderate to severe spasms were found up and down her back. (*Id.*) Overall, the diagnosis was severe cervical, lumbar, and dorsal sprains, with radiculopathy. (*Id.*)

Over the following months, Plaintiff received a series of treatments, apparently from Dr. Policherla. (*Id.*, PageID.501-14.) Most of the scrawled notes are indecipherable, but legible fragments are dotted throughout. On a few occasions, the notes suggest Plaintiff might be depressed. (*Id.*, PageID.501-04, 507-09.) The notes also seem to chart her headaches, although whether that condition improved or worsened, I cannot tell. (*Id.*) Other notes appears to suggest that she had a "strong prolonged stand/walk." (*Id.*, PageID.504-05.) In March 2005, a motor-nerve study confirmed radiculopathy at a few spinal levels. (*Id.*, PageID.511-14.)

The record then jumps to December 2010, with a brief note from Dr. William Gonte mentioning Plaintiff's "difficulty with a lot of headaches and some memory issues." (*Id.*, PageID.596.) He was treating these issues with prescription medications. (*Id.*) Subsequent sessions mirrored these notes. (*Id.*, PageID.591, 592 (March 2011, noting difficulty sleeping, too), 593, 594.) In a January 2011 "To Whom It May Concern" letter, Dr. Gonte wrote that Plaintiff's head injury had caused photosensitivity. (*Id.*, PageID.595.)

But in May 2011, Dr. Gonte pronounced that Plaintiff "is doing much better overall with her current medication," and he advocated for "a more aggressive home program, including pool walking . . . ." (*Id.*, PageID.590.) The following month she continued "doing much better overall," with sunglasses helping "significantly." (*Id.*, PageID.589.) But

dizziness sometimes rendered her unable to walk. (*Id.*) In July, she complained of morning stiffness, but Dr. Gonte observed that she was "doing much better" and "[h]er headaches are abating . . . ." (*Id.*, PageID.588.) The physical therapy was helping, Plaintiff reported at the next session, in August. (*Id.*, PageID.587.) "Overall she seems to have made some good strides toward recovery" and her migraines were less troublesome. (*Id.*) Walking in the pool was helping too. (*Id.*, PageID.596.)

By September, she was doing so well that Dr. Gonte was considering discharging her from the occupational and physical therapy program. (*Id.*, PageID.595.) The progress continued into December. (*Id.*, PageID.582 ("She has been having less frequent headaches, and is doing well with her home program," and while cold weather irritated her, "she is tolerating it better . . . ."); 583 ("She is doing fairly well," although she noticed her condition worsened with weather changes, but "[h]er headaches have been under control and she is sleeping better."); 584 ("She is doing well with her current treatment regimen. She also states she is having less [*sic*] headaches . . . .").)

At the start of 2012, Dr. Gonte wrote that Plaintiff was symptomatic but now tolerated her headaches, continued "to make good progress," and had made "good gains with her strength." (*Id.*, PageID.581; *see also id.*, PageID.580 (noting her progress in February 2012.).) In spring 2012, she was "increasing her activity level and strengthening program," although Dr. Gonte noticed lumbar radiculitis during the session and also wrote that her right leg was numb and weak, a condition which worsened in May. (*Id.*, PageID.578-79.)

In June 2012, Dr. Gonte noted continued progress but also acknowledged her persistent complaints of headaches and lower back pain that radiated to her legs. (*Id.*, PageID.577.) The following month was marked by gradual improvement, including with her headaches. (*Id.*, PageID.576; *see also id.*, PageID.573 (noting her improvements but recognizing she remained symptomatic); 574 (noting in September 2012 that "[o]verall she continues to improve though she is still quite symptomatic," and also that her headaches and "overall generalized pain" had improved); 575 (noting in August that she continued to improve and "[h]er headaches are better controlled, but she is still symptomatic at times," though she did better when "she takes precaution and preventative measures").) But in December 2012, she complained of a severe headache and a recent "exacerbation." (*Id.*, PageID.572.) Yet, the next month, her headaches had improved. (*Id.*, PageID.570.) After a thorough examination, Dr. Gonte found no abnormalities: her neck was supple with full range of motion, her extremities had full range of motion, her back had full range of motion and no spasms, her mental status was at 10 out of 10, and her strength was at 5 out of 5. (*Id.*) At the next session, the examination results were the same and she was "doing very well." (*Id.*, PageID.568.) Dr. Gonte "encouraged her to increase her activity level and continue her strengthening program." (*Id.*, PageID.569.)

Plaintiff's progress persisted into 2013. At a January consultation with Dr. Gonte, Plaintiff's examination results were normal. (*Id.*, PageID.396) In particular, she had "[f]ull range of motion in the neck" and "[g]ood shoulder shrugs, no winging of scapula," and her "[e]xtremities had full range of motion," her mental status was "10/10," her muscle strength was "5/5," her gait was "good," and her back had "full range of motion with no spasm

noted." (*Id.*) Plaintiff had been getting these good results in part due to her "home program," and her "medication regimen seem[ed] to be controlling her major problems." (*Id.*) In April, the examination results were the same and Dr. Gonte wrote that "[s]he is doing very well." (*Id.*, PageID.398.) Yet, without any intervening medical reports, in April 2014 Dr. Gonte scribbled a note that Plaintiff "is unable to work indefinitely," and that her diagnosis was "closed head injury" and "lumbar & cervical radic." (*Id.*, PageID.423.)

Beginning in March 2011, Plaintiff started physical therapy. (*Id.*, PageID.623.) The "subjective data" section of the initial report mentions Plaintiff's January 2005 accident, when the problems began, and also a May 2007 car accident. (*Id.*) Her pain—centered in her thoracic and lumbar spine and radiating down her right leg—typically stayed at 7 out of 10 on a visual analogue scale, although it worsened with movement or physical activities. (*Id.*) Plaintiff believed that "her gait is affected due to her ongoing symptoms." (*Id.*) Since starting physical therapy, her condition had improved. (*Id.*) Generally, remaining in a static posture relieved her symptoms. (*Id.*) Sudden turns of her neck produced cervical spinal pain, at about a 4 out of 10. (*Id.*) She was beset by headaches every other day. (*Id.*) All of these issues made sleep difficult, but medications helped her get rest. (*Id.*) Still in the "subjective" section, the report notes that she had "restrictions with her light daily activities" and she "requires assistance with household chores and light daily activities." (*Id.*)

On examination, her back was tender to the touch and displayed muscle spasms. (*Id.*) Her cervical spine had full range of motion (with pain) during protrusion and flexion; but on retraction and extension her range of motion was reduced by 25 percent. (*Id.*) Her

11

thoracic spine had full range of motion with pain (sometimes severe); her lumbar spine had "major restriction and . . . severe pain" during "extension in standing," while other movements with the lumbar spine produced some pain and had less significant restrictions. (*Id.*) Her arms and legs had full range of motion, although her right knee experienced some pain. (*Id.*, PageID.623-24.) Her strength was three to four out of five throughout. (*Id.*, PageID.624.) Her sensation was inconsistent, there was radiating pain in her right thigh, and her gait was independent but slow and guarded. (*Id.*) On daily activities, she was independent in self care but needed "assistance with mild or heavy impact daily activities and light household chores." (*Id.*)

At a subsequent session in March 2011 she complained of wrist pain (rating it at about 5 to 6 out of 10) and right shoulder pain (5 out of 10). (*Id.*, PageID.621.) The examiner found decreased grip strength and decreased range of motion with her wrists and right shoulder. (*Id.*)

The following month, Plaintiff continued to complain of pain. (*Id.*, PageID.617.) Her right knee, in particular, was bothering her. (*Id.*) The pain abated with rest or medication. (*Id.*) Her headaches continued intermittently, and she took medication for them. (*Id.*) Occasional dizziness was also present. (*Id.*) Her physical examination results were about the same as the previous month's: she had full range of motion in many measures, but pain was present, and her motions with her lumbar spine, in particular, were restricted; her strength remained at three to four out of five; her gait remained slow and guarded; and she continued to restrict her daily activities. (*Id.*, PageID.617-18.) At a second session that same month, she renewed her complaints of wrist pain and noted her wrists

12

sometimes swelled, although the pain was not quite as severe as it had been and she was currently experiencing no right shoulder pain. (*Id.*, PageID.615.) After an assessment, the therapist noted "gain in [range of motion] in her wrists and shoulder, and also gains in grip strength." (*Id.*, PageID.616.)

In May 2011, she told the physical therapist that pain in her spine and right knee was ongoing, as were migraine headaches, tinnitus (four to five days a week), and occasional dizziness and nausea. (*Id.*, PageID.610.) Her examination results were similar to those above, *e.g.*, some movements of the spine were restricted and some produced pain. (*Id.*) Her wrist pain persisted as well. (*Id.*, PageID.608.) She could lift a coffee mug, but carrying it 15 to 20 feet would fatigue her wrists and force her to set it down. (*Id.*) The range of motion in her wrists and right shoulder had slightly decreased, as had her grip strength. (*Id.*)

At a June 2011 session with the physical therapist, she described neck pain at about 6 out of 10, thoracic region pain at 5, lumbar pain at 7.5, and right knee pain at 2. (*Id.*, PageID.602.) The objective examination findings were essentially the same as the earlier ones. (*Id.*, PageID.602-03.) Her wrists' range of motion had increased slightly, although they hurt too much to test her strength. (*Id.*, PageID.600.)

Plaintiff was discharged from therapy in September 2011. (*Id.*, PageID.566.) The ending report noted her continuing pain, disturbed sleep, restricted range of motion, reduced strength in her extremities and back, and reports of inconsistent sensation. (*Id.*) The report also states that Plaintiff was "completely dependent for all of her self-care and

13

light daily activities." (*Id.*) Many years later, Plaintiff asserted that the physical therapy had only exacerbated her symptoms. (*Id.*, PageID.519.)

At an annual physical in June 2014 with Dr. Fouad Batah, the examination uncovered no abnormalities, although it appears that her musculoskeletal system was not examined. (*Id.*, PageID.402.) A brain MRI from that same month was unremarkable. (*Id.*, PageID.413.) The following month, she returned with severe daily headaches that blurred her vision. (*Id.*, PageID.406.) The examination again produced normal results, without mention of her musculoskeletal system except a note that her neck was supple. (*Id.*, PageID.407-08.)

In September 2014, psychiatrist Dr. L. Imasa evaluated Plaintiff's mental health as part of the application for Social Security benefits. (*Id.*, PageID.416.) Plaintiff complained of concentration and memory troubles, as well as anxiety and depression, crying spells, self-isolation, and sleeping problems. (*Id.*) At the time, Plaintiff lived with her mother but could not help around the house. (*Id.*, PageID.417.) Though she did not regularly see a psychiatrist, she took an antidepressant and Dr. Imasa believed "[f]urther testing such as psychological testing would be beneficial with regard to her current mental status and also in reference to the physical symptoms . . . to see how she is doing physically." (*Id.*, PageID.418.) Dr. Imasa noted, twice, that Plaintiff's physical treatments had been going well, information she apparently received from Dr. Gonte's notes. (*Id.*, PageID.416, 418.) During the examination Plaintiff was "in good contact with reality," said she felt "okay" about herself, and "responded to questions spontaneously." (*Id.*, PageID.417.) Nonetheless, Dr. Imasa concluded that Plaintiff "is not able to function on a fully sustained basis until

14

there is some form of clearance with regard to her physical condition as well as follow-up with her mental state." (*Id.*, PageID.418.)

In October 2014, psychologist Dr. Kathy Morrow reviewed Plaintiff's records as part of the application process. (*Id.*, PageID.173-74.) She determined the following: Plaintiff had no limitations in adaptations, understanding, memory, or social interaction, but did have limitations in sustaining concentration and persistence; moderate limitations in carrying out detailed instructions and maintaining attention and concentration for extended periods; and no significant limitation in all other abilities, which included carrying out short and simple instructions, performing activities on a regular schedule, sustaining ordinary routines without supervision, working near others without distraction, making simple work-related decisions, and completing a normal workday at a consistent pace without distractions from psychological-based symptoms. (*Id.*, PageID.173.) Dr. Morrow explained her opinion by noting that Plaintiff was not in psychological treatment and her "overall daily functioning appears to be intact." (*Id.*, PageID.173-74.)

In July 2015, testing showed that Plaintiff had an ovarian mass, which further examination revealed was benign. (*Id.*, PageID.431-32, 436-37.) Associated symptoms included abdominal and pelvic pain and bloating. (*Id.*, PageID.447.) She was diagnosed with endometriosis. (*Id.*, PageID.437.) She had a hysterectomy and other procedures done later that year and the next. (*Id.*, PageID.443-46, 650-69.) As one report explained, Plaintiff "underwent a total abdominal hysterectomy, bilateral salpingo-ooph[o]rectomy and extensive lysis of adhesions. The procedure was complicated by right ureteral transection. Urology was consulted intraoperatively and performed a JJ stent placement, ureterostomy

and cystoscopy. A JP drain was placed intraoperatively." (*Id.*, PageID.444.) During the surgery she suffered acute blood loss, requiring a transfusion. (*Id.*) Apparently, too, her ureter implant—which had received when she was four—was "nicked" during the removal of the cyst. (*Id.*, PageID.519.)

During this period she continued receiving treatments for this and other uterine and related issues. (*Id.*, PageID.628-69.) Her relevant complaints during this period included, at various times, vomiting and flank and abdominal pain. (*Id.*, PageID.630, 632, 636.) She also mentioned her ongoing issues with back and joint pain, muscle weakness, dizziness, anxiety, and depression. (*Id.*, PageID.638, 646.) The examination results at the sessions for these treatments were normal. (*Id.*, PageID.630, 633, 638, 646-47.) In April 2016, a ureteral obstruction developed, which the doctor cautioned was "a very difficult problem" requiring a "complicated surgery" to repair. (*Id.*, PageID.637, 639, 645.) Stents had been used to treat the issues, but in June 2017, she finally had another lysis of adhesions and a right ureteral reimplant. (*Id.*, PageID.516.)

Plaintiff underwent a consultative examination with Dr. Cynthia Shelby-Lane in November 2015. (*Id.*, PageID.482.) Her complaints remained the same, and she again recounted her history of automobile accidents. (*Id.*) She added that in 2010 she had been treated in the emergency room for severe headaches. (*Id.*) The report mentions that Plaintiff had seen a psychiatrist in 2005 and had been on psychiatric medication. (*Id.*, PageID.483.) During the examination, Plaintiff could tandem walk and heel and toe walk slowly, and she got on and off the examination table slowly, but she did not use a cane or assistive device and her gait was stable and normal. (*Id.*, PageID.484, 495.) She could "squat to 70% of the

16

distance and recover and bend to 90% of the distance and recover." (*Id.*, PageID.495.) Plaintiff's range of motion was normal by every measure, including in her spine, shoulders, knees, and wrists (although one of the six types of hip motion was limited by about half). (*Id.*, PageID.492-93.) She could complete all relevant activities, such as sitting, dressing, picking up coins, squatting, and climbing stairs, though some of these caused pain. (*Id.*, PageID.494.) Her arms and legs had normal reflexes. (*Id.*) No findings were flagged as abnormal. (*Id.*, PageID.484.) The examiner concluded there was "no evidence of neurological disorganization or joint instability. The examinee will need long-term, ongoing care, management and support for these chronic bone and joint disorders and chronic pain." (*Id.*, PageID.485.)

Dr. Shelby-Lane also offered specific limitations on work-related activities. (*Id.*, PageID.486-91.) Plaintiff could occasionally (*i.e.*, up to one-third of a workday) lift and carry up to 20 pounds. (*Id.*, PageID.486.) She could sit, stand, or walk for an hour at a time without interruption, and she could sit for 5 hours total during a workday, stand for 3 hours, and walk for 3 hours. (*Id.*, PageID.487.) She did not need a cane or other aid with walking. (*Id.*) As for her hands, she could frequently (*i.e.*, up to two-thirds of the workday) reach, handle, finger, feel, push, and pull with both hands. (*Id.*, PageID.488.) Likewise, she could frequently operate foot controls. (*Id.*) Postural-related activities—climbing stairs and ramps, balancing, stooping, kneeling, crouching, and crawling—were limited to occasional, but she could never climb ladders or scaffolds. (*Id.*, PageID.489.) Plaintiff's conditions did not affect her ability to engage in any daily activities, including shopping, traveling alone, walking "a block at a reasonable pace on rough or uneven surfaces," using

17

public transportation, preparing simple meals, maintaining personal hygiene, climbing "a few steps at a reasonable pace with the use of a single handrail," and sorting, handling, and using papers and files. (*Id.*, PageID.491.)

A sleep study in fall 2015 ruled out sleep apnea. (*Id.*, PageID.440.) But almost two years later, she remained fatigued and complained of excessive sleepiness. (*Id.*, PageID.671.) In July 2017, Dr. Divya Venkat noted that prior testing indicated possible restless leg syndrome. (*Id.*, PageID.671-72.) On examination, Plaintiff appeared normal; in particular, her neck was supple; she had normal gait, station, strength, and muscle tone; and her mood and affect were normal. (*Id.*, PageID.674.) He prescribed medications and iron therapy to help with her nocturnal awakenings, infrequent wheezing at night, and restless legs. (*Id.*, PageID.675-76.) Later respiratory test results were largely normal. (*Id.*, PageID.685.)

In July, Plaintiff saw Dr. Samear Sawalha, and aside from noting her radiating neck pain, said she had "no acute concerns." (*Id.*, PageID.558.) The examination results were normal. (*Id.*, PageID.559.) In September, Plaintiff returned to Dr. Sawalha complaining of sharp knee pain that registered at 4 out of 10 on a visual analogue scale. (*Id.*, PageID.552.) Rest and medication eased the pain, (*id.*), but she claimed, too, that various pain medications were unhelpful, (*id.*, PageID.553.) She also added that neck pain was at 5 out of 10. (*Id.*, PateID.552.) The examination did not highlight any abnormalities. (*Id.*) The same month, Dr. Sawalha reviewed MRIs of Plaintiff's knees: the left knee had no issues except "tibial tuberosity fr[a]cture on lateral view"; the right knee was normal. (*Id.*, PageID.562.)

18

On August 8 2017, Plaintiff saw Dr. Nilofer Nisar at Wayne Neurology. (*Id.*, PageID.522.) There, she characterized her 2005 wound as a traumatic brain injury. (*Id.*) Her migraines now occurred daily, she claimed, and medications were little help. (*Id.*, PageID.522, 524.) However, she also claimed that one medication, Onzestra, "took her migraine away." (*Id.*, PageID.519.) In addition, she thought she had nerve damage in her extremities, and her back sometimes tingled. (*Id.*, PageID.522.) On examination, Dr. Nisar observed "cognitive problems," apparently due to Plaintiff's "difficulty providing her history" and also short-term memory troubles. (*Id.*, PageID.523.) Moving her right arm overhead produced pain in her shoulder, she had decreased sensation in her legs, her strength was largely normal in her arms and legs, and her gait was stable but tandem gait was difficult. (*Id.*) Dr. Nisar put her on medication for mood, headaches, and neurologic symptoms (*i.e.*, concentration, attention, and memory), suggested she consider Botox for the migraines, and recommended electrodiagnostic testing for her extremities. (*Id.*)

The extremities testing in August and September showed radiculopathy at the C6-C7 level, and irritability in the neck muscles, but "no definitive radiculopathy seen in the lower extremity" and "no electrodiagnostic evidence of myopathy or neuropathy involving the tested extremities." (*Id.*, PageID.528, 536.) Along with medication and a TENS unit, Dr. Nisar recommended she exercise and stretch. (*Id.*, PageID.529.) A "sleep deprived electroencephalographic (EEG)" study, also conducted by Dr. Nisar, revealed abnormalities, (*id.*, PageID.530), but an "awake and drowsy EEG" returned normal results, (*Id.*, PageID.538).

Later in September, Dr. Nisar received imaging studies of Plaintiff's spine. (*Id.*, PageID.540-43.) The studies of the cervical spine revealed only "[m]ild left neural foraminal narrowing at C4-C5 and C5-C6. Otherwise, no spinal canal stenosis," disc protrusion, or other neural foraminal narrowing. (*Id.*) The lumbar spine showed no abnormalities, and there was "[n]o evidence of lumbar spinal canal or foraminal narrowing." (*Id.*, PageID.543.)

## 2. Application Reports

Plaintiff completed an Adult Function Form in July 2014. (*Id.*, PageID.331.) Migraines and back and neck pain prevented her from working, she claimed. (*Id.*) On a typical day, she would take medication, "lie down as needed, look at television," and attend doctor's appointments. (*Id.*, PageID.332.) Physical activities she once enjoyed, such as skating and bowling, were now too much for her. (*Id.*) If her pain intensified, she needed help dressing, bathing, and doing her hair, and she used sticky notes to remind herself to attend to these tasks. (*Id.*, PageID.333.) A daily pill box kept her medication regimen in order. (*Id.*) She could no longer cook, but she left blank the line on the form for explaining why; on another line, however, she observed that since the onset of her conditions she would sometimes "forget I'm cooking." (*Id.*) She was in "[t]oo much pain to do house or yard work." (*Id.*, PageID.334.) "A couple times a week," Plaintiff left the house, either by driving or riding in a car, sometimes alone. (*Id.*) But she did not go shopping. (*Id.*) Managing money—*i.e.*, paying bills, counting change, handling a savings account, and using checkbooks or money orders—presented no difficulties. (*Id.*) She had no social life and the only place she went on a regular basis was the doctor's. (*Id.*, PageID.335.) The

conditions afflicting Plaintiff limited her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. (*Id.*, PageID.336.) She did not handle stress or changes to her routine well. (*Id.*, PageID.338.)

Plaintiff's mother also filled out a Function Form in July 2014 on behalf of her daughter's application. (*Id.*, PageID.323.) Asked how Plaintiff's illnesses impeded her ability to work, her mother simply stated, "She's disabled." (*Id.*) Plaintiff needed help with personal care only when her pain level was high. (*Id.*, PageID.324.) Her conditions affected sleep "because she has nightmares," her mother wrote. (*Id.*) Plaintiff employed sticky notes as reminders for personal care, and her mother helped her remember to take medicine. (*Id.*, PageID.325.) Plaintiff could not prepare meals because she "[b]urns everything." (*Id.*) She did no household chores, nor did she do yardwork—because "she is disabled," her mother noted. (*Id.*, PageID.325-26.) She "sometimes" left the house, and could go out alone; she continued to drive and ride in cars. (*Id.*, PageID.326.) Managing money was no problem for Plaintiff. (*Id.*) Her social life was non-existent, and the only place she frequented was the doctor's, sometimes needing someone to accompany her there. (*Id.*, PageID.327.) Her mother gave the same list as Plaintiff of the abilities limited by Plaintiff's conditions. (*Id.*, PageID.328.) But getting along with others, such as authority figures, was no trouble. (*Id.*, PageID.329.) She did a poor job handling stress and changes in her routine. (*Id.*)

### 3. Administrative Hearings

The record contains transcripts from three hearings: (1) a 2011 hearing on her earlier application; (2) a 2015 hearing on her current application before the Appeals Council

21

remand; and (3) a 2017 hearing on her current application after the remand. (*Id.*, PageID.69-142.) I will briefly review all three proceedings.

### a. 2011 Hearing

At the time of the 2011 hearing, Plaintiff lived with her mother and a nephew in a two-story house with a basement. (*Id.*, PageID.75-76.) She had some prior work experience, and had been planning to start a new job in 2005 when the car accident occurred. (*Id.*, PageID.77.) As she had told her doctors, her symptoms included daily headaches, knee problems, shoulder and neck and hand pain, right-side weakness, memory issues, and depression, which stemmed from her inability to socialize due to her physical condition. (*Id.*, PageID.78-79.) About four days a week her depression struck, causing crying spells and anxiety. (*Id.*, PageID.84.)

Medication helped her headaches, and she could function "pretty well" after taking it, but she would experience pain in her neck and back and needed medications for those too. (*Id.*, PageID.79-80.) She could carry a gallon of milk in her right hand. (*Id.*, PageID.80.) She denied being unable to walk, explaining that she simply could not do so for more than a block and a half; likewise, she could stand for only about 15 to 20 minutes, and sit for 45. (*Id.*) She could watch television and "[v]ery rarely" would go online. (*Id.*, PageID.81.) Sometimes she needed help "reaching" in the shower. (*Id.*, PageID.82.) She would go shopping with her mother, but she did not cook, clean the dishes, or do the laundry. (*Id.*) Medications also helped with her depression and sleeping troubles, but they could cause dizziness, fatigue, and weakness. (*Id.*, PageID.83.) Each day, she took 3 to 4 naps lasting anywhere from 45 minutes to a few hours. (*Id.*, PageID.83-84.)

### b.  2015 Hearing

This hearing was held on October 23, 2015. (*Id.*, PageID.93.) A month prior, Plaintiff testified, she had had surgery for endometriosis. (*Id.*, PageID.96, 99.) Her other conditions included recurrent nausea, nerve damage in her neck and spine, memory issues, headaches, and pain in her neck, back, knees, stomach, and wrists. (*Id.*, PageID.100.) She had also received a diagnosis for some sort of degenerative bone disease, but she could not recall what. (*Id.*) Most recently, she had worked five hours a day, four days a week for about two weeks in 2013 as a cashier. (*Id.*, PageID.100-01.) She had spent most of the workday standing, with only a couple hours of sitting allowed, and was required to lift up to five pounds. (*Id.*, PageID.101-02.) The need to stay standing and her constant pain were what forced her out of the job, she testified. (*Id.*, PageID.102-03.) About 30 minutes was the longest she could stand. (*Id.*, PageID.108.) As for sleep, she could rest for only about an hour before she woke, and so she napped every day; her medications also caused somnolence and led her to rest during the day. (*Id.*, PageID.104.) Regarding strength, her doctor advised against lifting anything, even just a gallon of milk. (*Id.*, PageID.108.)

She sometimes needed help with personal care, as she had stated in her function report. (*Id.*, PageID.105.) And as in that report, she claimed to rarely shop. (*Id.*) She did not cook, but could use a microwave and prepare simple meals; she could not wash dishes by hand, vacuum, sweep, or mop; and she did not do laundry or yardwork or take out the trash. (*Id.*, PageID.105-06.) She would watch television for about an hour and go online for 15 or 20 minutes at a time. (*Id.*, PageID.107.)

### c.  2017 Hearing

At the most recent hearing, she repeated the problems preventing her from working, such as migraines and back pain. (*Id.*, PageID.122-23.) In addition, she noted she had asthma, and humidity affected her breathing. (*Id.*, PageID.124.) Her ureteral reimplant surgery had affected her bladder, and she sometimes experienced accidents. (*Id.*)

Many things remained the same as in previous hearings, reports, and medical records: she continued to live with her mother; she could still drive; sometimes she needed help with personal care such as washing her hair; she could microwave meals but not cook because she would forget about the food and as a result had almost burned the house down on one occasion; during a normal day she took her prescriptions and rested; she did not socialize; and she used a pill box to keep her medications organized. (*Id.*, PageID.125-28.)

A few new facts were brought up: she sometimes folded laundry and fed their pet bird, and she also could not recall any side effects from her medications. (*Id.*, PageID.126.) She also gauged how much sunglasses and medication helped her headaches: they brought the pain down to about a 6 or 7 out of 10; without them the pain was at a 10. (*Id.*, PageID.129.) In addition, she estimated that sitting for 30 to 45 minutes was the most she could manage before needing to stand for a minute. (*Id.*, PageID.130.) While she could drive, her usual trips were only around 10 to 15 miles. (*Id.*, PageID.131.) She further testified that she needed help standing at times, but could steady herself on a table or the like and therefore did not have a cane. (*Id.*, PageID.132-33.) Unlike the previous hearing, she now said that she could lift a gallon of milk, but it was painful due to her bad wrists and right shoulder. (*Id.*, PageID.133.)

The ALJ then asked the vocational expert (VE) to assume a hypothetical individual with an RFC identical to the one from 2011 ALJ decision. (*Id.*, PageID.136); *see supra* footnote 6 (quoting the 2011 RFC). Such an individual could not perform Plaintiff's past jobs, but could perform other work in the national economy: assembly, inspection, packaging position (100,000 positions nationally); clerical sorter (80,000 positions); and protective service clerk (more than 120,000 positions). (*Id.*, PageID.136-37.) The ALJ then crafted a second hypothetical person with Plaintiff's characteristics who

> can perform work at the light exertional level with the following limitations. Frequently reach in all directions bilaterally, frequently handle, finger, and feel bilaterally, frequently push and pull bilaterally, frequent use of foot controls bilaterally, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance and stoop, occasionally kneel, crouch, and crawl, never exposed to unprotected heights and moving mechanical parts, avoid concentrated exposure to vibrations, avoid concentrated exposure to humidity and wetness, avoid concentrated exposure to extreme cold and extreme heat, avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants, limited to perform simple, routine, and repetitive tasks but not at a production rate pace, use judgement in the workplace limited to simple work-related decisions, deal with changes in the work setting limited to simple work-related decisions, a sit/stand option permitting change in position if needed and without disturbing the workplace.

(*Id.*, PageID.137-38.) That person could not perform Plaintiff's past work but could do the following: hand packager ("greater than" 80,000 positions); small products assembler ("greater than" 80,000 positions); and visual inspector checker ("greater than" 80,000 positions). (*Id.*, PageID.138-39.) If that same person was at the sedentary exertional level, he or she could do the same jobs in the same numbers. (*Id.*, PageID.139.) But if that individual had any of the following limitations, work would be precluded: no "persistence, pace, or concentration to perform simple, routine tasks on an eight-hour day, five-day a

week, 40 hours a week, or equivalent basis"; off-task 20 percent of the time; 3 or more absences a month. (*Id.*, PageID.139-40.)

Plaintiff's attorney then asked the VE what jobs would remain available to the second hypothetical individual if he or she could only occasionally finger: only the hand packing position, the VE replied. (*Id.*, PageID.140.) If that person could only occasionally stoop or bend, work would not be precluded, the VE testified. (*Id.*, PageID.140-41.) And if the individual "required constant redirection from supervisors," then no jobs would be open. (*Id.*, PageID.141.)

### E.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[7] group the sources of evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 416.913

---

[7] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

(2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 416.913(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those

27

factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 416.927(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R.§ 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

28

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996).[8] Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 416.927(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

---

[8] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. §§ 404.1529(c), 416.929(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *rep. & rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 19, 2017), *rep. & rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

### F. Arguments and Analysis

Plaintiff presents three arguments: (1) "The ALJ committed reversible error in failing to comply with the Appeals Council's prior remand order," (R. 11, PageID.707-08), (2) the ALJ's finding that Plaintiff can perform light work was erroneous because "overwhelming evidence confirms that . . . [she] lacks ability to stand and walk for 6 hours out of an 8-hour work day," (*id.*, PageID.709-11), and (3) the "ALJ failed to properly assess the Plaintiff's mental RFC as required by SSR 96-8p," (*id.*, PageID.711-13).[9] I will address each argument in turn.

### 1. Appeals Council's Remand Order

Plaintiff's first argument points to 20 C.F.R. § 404.977(b),[10] which requires that an ALJ with a case on remand from the Appeals Council "take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." (R. 11, PageID.707.) Later in the argument, Plaintiff notes that the "Commissioner has a clear, nondiscretionary duty to comply with his [or her] own regulations and has a duty to comply with controlling case law." (*Id.*, PageID.708.) Here, according to Plaintiff, the ALJ flouted the remand order by failing to consider her "new condition," the cystic mass removed from her uterus and the surrounding complications. (*Id.*, PageID.708.) She adds that "[r]easonable minds could agree that based

---

[9] While the heading of Plaintiff's third argument also states that the ALJ violated SSR 85-15, Plaintiff offers no discussion of that Ruling.

[10] That regulation, however, pertains to Disability Insurance Benefits under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* Plaintiff should have cited 20 C.F.R. § 416.1477(b), which applies to SSI, the program at issue here. But the mix-up is immaterial because these regulations are identical.

on the medical evidence Plaintiff will be incapable of performing sedentary or light work

at the skilled or unskilled level." (*Id.*)

Plaintiff asks for relief that the Court lacks jurisdiction to give. As I have previously

explained,

> Of the courts in the Sixth Circuit that have considered the question, most have found they lacked jurisdiction to evaluate whether an ALJ complied with a remand order from the Appeals Council. Their reasoning is based in the fact that federal courts are courts of limited jurisdiction, and have been authorized to evaluate only "the final decision of the Commissioner." 42 U.S.C. § 405(g). Where the Appeals Council denies a claimant's request for review of an ALJ's decision—as it did here, after the most recent hearing, (PageID.47)—the Court reviews the decision of the ALJ rather than the findings of the Appeals Council. 20 C.F.R. § 416.1481. These courts therefore regard the ALJ's compliance with an Appeals Council remand order as an internal agency matter that arises prior to the issuance of the agency's final decision, and thus falls outside the court's jurisdiction. *E.g.*, *Brown v. Comm'r of Soc. Sec.*, No. 1:08CV183, 2009 WL 465708, at *5 (W.D. Mich. Feb. 24, 2009) (finding the court lacked jurisdiction to review whether the ALJ complied with the Appeals Council's remand order); *Coleman v. Berryhill*, Case No. 1:16CV00931, 2017 WL 1208760, at *16–17 (N.D. Ohio Feb. 17, 2017) (same); *Cooper v. Colvin*, No. 5:13-CV-00217, 2014 WL 2167651, *2 (W.D. Ky. May 23, 2014) (same); *Prichard v. Astrue*, No. 2:08–0055, 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28, 2011), *report and recommendation adopted*, 2011 WL 113755 (M.D. Tenn. Mar. 25, 2011)(same); *Riddle v. Astrue*, No. 2:06-00004, 2009 WL 804056, at *19 (M.D. Tenn. Mar. 25, 2009) (same); *Shope v. Comm'r of Soc. Sec.*, No. 2:14-cv-2055, 2015 WL 3823165, at *8–9 (S.D. Ohio June 19, 2015), *report and recommendation adopted*, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015) (same).

*Smith v. Comm'r of Soc. Sec.*, No. 2:17-cv-13367, 2018 WL 7364646, at *10 (E.D. Mich.

Oct. 26, 2018), *rep. & rec. adopted by* 2019 WL 700096 (E.D. Mich. Feb. 20, 2019).

Indeed, the Supreme Court recently noted that the phrase "final decision" in § 405(g)

"clearly denotes some kind of terminal event . . . ." *Smith v. Berryhill*, 139 S. Ct. 1765,

1774 (2019) (footnote omitted).[11] A remand order such as the one here, by contrast, comes *in media res*. It kicks the case back to the ALJ for reconsideration of the issues the Council specifies and anything else the ALJ wishes to examine, so long as the remand order is complied with. 20 C.F.R. § 416.1477(b). The case is not over when the remand order issues.

Plaintiff presents no discussion on the Court's jurisdiction to entertain this argument. Because I conclude the Court lacks jurisdiction to review the remand order, I recommend rejecting Plaintiff's first argument.

To the extent the argument could be read as a freestanding claim that the ALJ simply disregarded her uterine issues, I suggest it would fail. The ALJ devoted enough attention to this topic. (R. 7, PageID.58-59.) The decision noted Plaintiff's hysterectomy, the surgical findings, the ureteral transection, the stents, and the subsequent procedures. (*Id.*) This evidence did not suggest severe limitations, the ALJ explained, because throughout the record physical examination results were routinely normal. (*Id.*, PageID.59.) For her part, Plaintiff does not take issue with this reasoning, nor does she recount the evidence in as much depth as the ALJ did. (R. 11, PageID.707-08.) Rather, she offers a few factual assertions taken from the record, then concludes without explanation that "overwhelming" evidence shows her condition declined "as it relates to her closed head injury, migraine headaches, neck and back pain, bilateral knee pain, lumbar radiculopathy, arthritis and

---

[11] The Court there held that the Appeals Council's dismissal of a claimant's appeal as untimely "is a 'final decision . . . made after a hearing' so as to allow judicial review under § 405(g)." *Smith*, 139 S. Ct. at 1771. That holding does not control the present case. As a technical matter, the two cases are distinct: *Smith* examined the dismissals of requests for appeals due to untimeliness, which the regulations allow in 20 C.F.R. § 416.1471; this case involves compliance with a remand order under 20 C.F.R. § 416.1477(b). More importantly, the logic of *Smith* does not apply here—the dismissal in *Smith* ended the administrative proceedings, the remand order here extended them.

depressive and anxiety disorder." (*Id.*, PageID.708.) Absent from this list is anything related to her abdominal or uterine problems. Thus, it is unclear why her surgeries and her complaints of abdominal pain demonstrate such a decline that she must be considered disabled.

It is more difficult to read Plaintiff's brief as offering an independent *res judicata* argument. She mentions that the remand order required the ALJ to consider the binding effect of the 2011 decision. (*Id.*, PageID.707.) She does not, however, discuss that earlier decision or challenge the ALJ's finding here that new and material evidence of Plaintiff's improved health unshackled the ALJ from the binding effect of prior findings. (R. 7, PageID.57.) Instead, Plaintiff states that she continued to decline after the prior decision, but nowhere does she add that, as a result, the prior decision was binding or not binding. Nor does she specify which prior findings should have controlled here or how those findings would have changed the outcome.

Also ignored is the recent caselaw clarifying how *res judicata* applies in Social Security decisions. *See Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018) (holding that *res judicata* does not "prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings"). "Courts applying *Earley* to ALJ decisions issued before that case—like the one here—have asked whether the ALJ, despite purporting to follow [older caselaw], gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate." *Neal v. Comm'r of Soc. Sec.*, No. 18-10709, 2019 WL 2208555,

at *9 (E.D. Mich. Jan. 31, 2019), *rep. & rec. adopted by* 2019 WL 1306162 (E.D. Mich.

Mar. 22, 2019). Here, the ALJ gave the evidence a "fresh look" and properly determined

that the prior decision was not binding. Most of the record consists of evidence created

after the 2011 decision. Significantly, Dr. Gonte's records beginning in 2012 noted

improvements in Plaintiff's condition and uncovered no abnormal examination results. (R.

7, PageID.396-98, 569-78.) The ALJ specifically cited this evidence to support the change

in Plaintiff's condition. In the absence of argument to the contrary, I suggest this constitutes

sufficient evidence for the ALJ to veer from the prior decision and also to support the

conclusion that Plaintiff's condition had improved.

Finally, tucked at the close of her first argument, Plaintiff asserts that "[h]ere, the

ALJ, again, failed to develop the record as required, and further failed to adequately assess

the disability determination from another governmental agency." (R. 11, PageID.708.)

Whence this assertion comes, I am uncertain, but it appears to have floated into this case

by mistake. Plaintiff has not argued that the record needs expanding, nor is it clear what

other agency disability determination Plaintiff is referring to.

### 2. Light Work

Plaintiff next argues that "[t]he medical documentation confirms that Plaintiff lacks

the ability to stand and work for 6 hours out of an 8-hour workday. She cannot, in fact,

perform light work as the ALJ found." (R. 11, PageID.709.) The legal basis for her

argument is SSR 83-10, 1983 WL 31251, at *5-6 (Jan. 1, 1983). There, the Commissioner

explained that "the primary difference between sedentary and most light jobs" is that

"[e]ven though the weight lifted in a particular light job may be very little, a job is in this

category when it requires a good deal of walking or standing . . . ." *Id.* at *5. The light exertional level "requires being on one's feet up to two-thirds of a workday," so it "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." *Id.* at *6.

As proof that Plaintiff cannot meet this requirement, she offers the following:

> The medical evidence confirms, in numerous locations, that Plaintiff suffers from chronic pain, tenderness and motion limitation in the back, neck and extremities. In fact, consultative examiner Dr. Shelby-Lane also referenced evidence of cervical radiculopathy, as recited on page 11 of the decision (R. 7-7, Tr. 29).

> In August and September of 2017, EMG/NCS studies revealed electrodiagnostic evidence of chronic C7, C6 radiculopathy involving the right and left upper extremities as well as significant muscle irritability in the neck and paraspinal muscles (R. 7-7, Tr. 482-501). Decreased sensations, positive Romberg testing and tenderness in the cervical paraspinal muscles were demonstrated in the medical records. (R. 7-2, Tr. 7-2, Tr. 26).

> Plaintiff's longstanding history of a closed head injury secondary to two motor vehicle accidents is also well established in the record (R. 7-7, Tr. 379, 445). Chronic, and very severe, headaches plague Plaintiff on a daily basis (R. 7-7, Tr. 485). Her migraines produce aura, black spots and blurred vision (R. 7-7, Tr. 363, 369, 379). Topomax, Imitrex and Fioricet are just a few of the medications that have been utilized to manage Plaintiff's debilitating migraines (R. 7-7, Tr. 365-67). Additionally, the arthritis in her hands and wrists cause further complications for her preexisting radiculopathy (R. 7-7, Tr. 516, 522, 563). . . .

> Further, she testified that she naps throughout the day and can barely lift a gallon of milk (R. 7-2, Tr. 101).

(R. 11, PageID.709-10.) From this, she concludes that "any reasonable mind would be able to determine that an individual suffering from the foregoing conditions would be unable to stand 6 hours of an 8-hour workday." (*Id.*, PageID.710.) She adds that the ALJ failed to consider "the additional stress that would be placed on someone with a history of chronic

and severe migraines . . . and a documented history of anxiety and depression." (*Id.*, PageID.710-11.)

A few problems are immediately apparent with Plaintiff's argument. First, she recounts raw medical evidence—such as imaging studies showing radiculopathy—as though it speaks to the functional limitations her conditions impose. For example, the implied reasoning in her brief is that someone with radiculopathy or daily headaches or both cannot stand or walk for six hours in an eight-hour workday. The inference needs support from medical evidence, likely in the form of opinions, linking her radiculopathy to concrete limitations in standing and walking. Closing the gap between the bare medical reports and the claimant's capacities is usually beyond a judge's ken. That is why courts often but not always require that the RFC—crafted by a layperson, the ALJ—be supported by medical opinion evidence that can "make a logical bridge between the evidence relied on and the conclusion reached" regarding functional capacity. *Charbonneau v. Comm'r of Soc. Sec.*, No. 2:18-cv-10112, 2019 WL 960192, at *17 (E.D. Mich. Jan. 11, 2019) (quoting *McCaig on behalf of McCaig v. Comm'r of Soc. Sec.*, No. 16-11419, 2017 WL 4211047, at *8 (E.D. Mich. Aug. 25, 2017) (noting caselaw), *rep. & rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017)), *rep. & rec. adopted by* 2019 WL 952736 (E.D. Feb. 27, 2019).

Of course, the ALJ need not take a blinkered view of the evidence, refusing to reach commonsense conclusions unless backed by medical opinions or other explanatory materials. *Id.* at *16. And this caselaw does not directly apply to the showing a claimant must make. But it is the claimant's burden to "provide evidence . . . showing how your

36

impairment(s) affects your functioning during the time you say that you are disabled . . . ." 20 C.F.R. § 416.912(c) (April 2014). Here, Plaintiff's dry retelling of bare medical reports fails to show how her impairment limited her to walking or standing less than six hours during a workday. At best, a weak inference might arise that it would be difficult for someone with daily headaches to maintain this level of functioning—but by no means would this supposition inevitably lead to the conclusion that the person was incapable of it.

Second, and relatedly, Plaintiff does not clearly identify any errors in the ALJ's analysis; indeed, she fails to address that analysis at all. The most she says is that the ALJ did not consider the "additional stress" a light-work level would place on Plaintiff. (R. 11, PageID.710.) The type of "stress" is unclear: physical, mental, or both? She mentions "stress" in light of her migraines, depression, and anxiety, suggesting both physical and mental stress, but she does not explain how that stress affects her ability to walk or stand.[12] No other flaws in the ALJ's reasoning or evidentiary holes in the decision are noted.

I suggest that substantial evidence supports the ALJ's conclusion that Plaintiff could

---

[12] Plaintiff does even less with regard to the "use of hands and arms to grasp and turn objects," which she says "would additionally be troublesome." (R. 11, PageID.710.) The only other relevant comment she makes is that she could "barely lift a gallon of milk," according to her own testimony. (*Id.*) Plaintiff offers no explanation on how these stray observations about her arms and hands relate to her ability to stand and walk. Perhaps she means to more broadly question her light-work classification, as that exertional level generally "require[s] use of arms and hands to grasp and to hold and turn objects," a phrase plucked from SSR 83-10, 1983 WL 31251, at *6. But aside from her own statement at the hearing, Plaintiff does not present any evidence that her arms are limited, and she does not contest the ALJ's conclusion that her subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 7, PageID.57.) Given the lack of discussion, I would deem waived any argument premised on her hand and arm capacity. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)).

walk and stand long enough to sustain light-level work. Dr. Shelby-Lane's report and opinion, which the ALJ discussed, (R. 11, PageID.59-60), provide such evidence. As the ALJ noted, the doctor's opinion was that Plaintiff could stand and walk each for up to three hours in a workday. (R. 7, PageID.60, 487.) This adds up to six hours of standing and walking per workday, putting Plaintiff in the light-work category. Further, Dr. Shelby-Lane's examination findings support her opinion and thus the ALJ's decision, which also relied on them. (R. 7, PageID.59.) Those findings included normal range of motion in the spine, knees, shoulders, and wrists, as well as stable and normal gait, and normal reflexes. (R. 7, PageID.484, 492-95.)

Plaintiff does not challenge the ALJ's reliance on Dr. Shelby-Lane's opinion or otherwise attack that opinion. Instead, she merely notes that the accompanying report "referenced evidence of cervical radiculopathy . . . ." (R. 11, PageID.709-10.) "The mere diagnosis of [a condition], of course, says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) ("[N]ot every diagnosable impairment is necessarily disabling."). And as Defendant observes, Dr. Shelby-Lane rendered her "opinion that Plaintiff could do a range of light work *despite* that impairment." (R. 12, PageID.725.)

Other evidence the ALJ discussed bolsters the light-work finding. Dr. Gonte's records provide ample support for this conclusion. The ALJ observed that Dr. Gonte's examinations of Plaintiff in 2013 produced normal findings, (R. 7, PageID.57), and indeed they did: she had full range of motion in the neck, back, and extremities, good gait, normal

38

strength, and normal mental status, (*id.*, PageID.396, 398). These results do not suggest the need for any standing or walking limitations. Almost all of Dr. Gonte's earlier records indicate that Plaintiff's physical condition was improving despite some lingering pain and continued headaches. *See, e.g.*, (*Id.*, PageID.568, 570, 573-74, 576, 578-79, 580-81, 583, 588, 589, 590, 595.)[13]

This evidence reflects the record as a whole. While some tests shortly after her 2005 accident, and later, revealed pain with movement and some restrictions in range of motion, (*id.*, PageID.498, 500, 608, 610, 621), most others fail to reveal any severe physical limitations. For example, even in 2005, her shoulder and hips had largely normal ranges of motion. (*Id.*, PageID.500.) Her arms and legs often had full range of motion, and her back sometimes did too, although at times the movement was accompanied by pain. (*Id.*, PageID.623-24, 627.) Other reports showed normal station, gait, and strength. (*Id.*, PageID.504-05, 523, 674.)

Even the imaging and other diagnostic studies that showed impairments did not suggest they were severe. Studies in 2015, for instance, showed radiculopathy at one level of the cervical spine, as well as some undescribed muscle irritability, but no lower extremity radiculopathy or evidence in any extremity of myopathy or neuropathy. (*Id.*, PageID.528, 536.) A later study of the cervical spine displayed only "[m]ild left neural

---

[13] Plaintiff does not rely on Dr. Gonte's cursory note, dashed off in April 2014 and presented without context, that she was "indefinitely" unable to work. (R. 7, PageID.423.) The ALJ correctly "afforded little weight to this opinion because the opinion is vague, conclusory, and pertains to an issue reserved exclusively to the commissioner. Further the opinion appears inconsistent with Dr. Gonte's unremarkable physical exams of the claimant in 2013." (*Id.*, PageID.60.)

foraminal narrowing at C4-C5 and C5-C6," (*id.*, PageID.540), while a lumbar-spine study was normal, (*id.*, PageID.543). Many other examinations flagged no abnormalities, although it is unclear how extensive some of these tests were. (*Id.*, PageID.402, 407-08, 552, 630, 633, 638, 646-47.)

These reports amount to substantial evidence, which the ALJ thoroughly discussed in the decision. (*Id.*, PageID.57-59.) As such, I recommend rejecting Plaintiff's second argument. Even if Plaintiff had a point, and the ALJ's conclusion was erroneous, she has not clinched a reversal or remand because she has not shown any error was prejudicial. Her second argument is limited to knocking the RFC's light-work classification; she does not say what should replace it. This oversight is critical because the ALJ asked the VE how many jobs were available to someone with the same RFC as Plaintiff except at the sedentary level; the VE responded that just as many positions were open at the sedentary level as at the light level. (*Id.*, PageID.139.) Thus, even if Plaintiff succeeded in demonstrating that she cannot work at the light-exertion level, she has not undertaken the additional and necessary task of showing that a sedentary-exertion level was inappropriate too. Without that further argument, Plaintiff is left with an RFC at the sedentary level, which in turn leaves within her grasp all the jobs as before. Remand would therefore result in the certain reinstatement of the current decision, and therefore the error supporting that remand is harmless. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

### 3.  Mental Impairments

Plaintiff's final argument is that "the ALJ failed to adequately weigh the medical evidence pertaining to Plaintiff's RFC." (R. 11, PageID.712.)[14] This contention is premised on SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996), which mandates that the RFC encompass a claimant's nonexertional, *i.e.*, nonphysical, work-related limitations. "Work related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* Here, the ALJ limited her RFC to positions requiring "simple work related decisions" and "simple, routine, and repetitive tasks, but not at a production rate pace." (R. 7, PageID.56.)

Plaintiff contends that the ALJ botched this analysis for the following reasons:

> As noted on page 9 of the decision, neurological exams performed in August and September of 2017 revealed short-term memory problems as well as confirmation from treating sources that claimant had difficulty providing her "history" (R. 7-2, Tr. 27). It was stated that on a mental status exam, Plaintiff was "unable to recall any of the three objects after a brief delay." *Id.* Most importantly, Dr. Im[a]sa opined that Plaintiff "is not able to function on a fully sustained basis until there is some form of clearance with regard to her physical condition as well as a follow-up with her mental state." (R. 7-2, Tr. 28).
>
> Furthermore, Plaintiff's own testimony confirmed her mental

---

[14] Plaintiff leads off her argument with the assertion that remand is required because "there is absolutely no support for the ALJ's mental RFC assessment as the record is devoid of any RFC assessments from any physicians whatsoever." (R. 11, PageID.711.) One could interpret this as an argument that the ALJ attempted to construct the RFC based on her own assessment of the medical data, unguided by any expert opinions shaping that evidence into functional limitations. *Cf. Charbonneau*, 2019 WL 960192, at *14-17. But if that is what Plaintiff meant, she failed to pursue the thread. And, in any case, it would be wrong, as the ALJ's decision discussed medical opinions from two sources, Dr. Imasa and Dr. Morrow. (R. 7, PageID.60.)

limitations. She testified during the hearing that she had left cooking food on the stove only to remember it once the kitchen and home was full of heat and smoke (R. 7-2, Tr. 94). During the hearing Plaintiff struggled with providing the history of her medical health and employment history, as well as other details related to significant historical events in her life. If an ALJ fails "to make all the detailed findings required by the regulations and rulings . . . his RFC conclusions are not supported by substantial evidence." See *Southard v. Barnhart*, 72 F. App'x 781, 785 (10th Cir. 2003). A thorough examination of Plaintiff's mental RFC was lacking and a remand to correct such errors should be ordered.

(R. 11, PageID.712-13.)

Plaintiff's third arguments suffers from many of the same flaws as her first two: she broadly alleges that the ALJ erred, without describing any particular mistakes, then cites evidence that she has an impairment as proof that it severely limits her functioning and ignores other materials that cut against her case. Here, for example, she cites the ALJ's decision—not the actual medical records—for the assertion that examinations in 2017 demonstrated Plaintiff's short-term memory problems and difficulty recounting her own history. (*Id.*, PageID.712 (citing R. 7, PageID.59); *see also* R. 7, PageID.417, 523 (the 2017 examinations).) But the mere presence of problems, which is all that this evidence shows, does not speak to the severity of those problems or the degree of functional limitations they impose. And, of course, the ALJ acknowledged this piece of evidence but balanced it against others that Plaintiff overlooks. (R. 7, PageID.59-60.) Moreover, Plaintiff does not allege any errors in the ALJ's process, and thus her argument must be premised on the proposition that that the ALJ mis-weighed the evidence. The Court cannot, however, "review the evidence *de novo*, make credibility determinations nor reweigh the evidence." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Plaintiff hits closer to the mark by relying on Dr. Imasa's opinion that she could not "function on a fully sustained basis until there is some form of clearance with regard to her physical condition as well as follow-up with her mental state." (R. 7, PageID.418.) But she fails to grapple with the ALJ's analysis of this opinion. The ALJ offered valid reasons for affording the opinion little weigh: "it is vague, conclusory, and does not describe the claimant's impairments in terms of function-by-function restrictions," and it was "inconsistent with Dr. Im[a]sa's observations of normal behavior and only moderately limited memory on a mental status exam." (*Id.*, PageID.60.)

The opinion is indeed vague. As an example, it is unclear what Dr. Imasa meant by "function." Presumably it refers to functioning at a job, because nothing in the report indicates Plaintiff was unable to function at home other than her bare assertion that she did not help her mother with activities of daily living. (*Id.*, PageID.417.) The lack of clarity is, as the ALJ observed, compounded by Dr. Imasa's failure to opine on any particular non-exertional functions, such as memory or ability to understand. SSR 96-8p, 1996 WL 374184, at *6.

Adding to the confusion is that the opinion is only provisional, premised on the need for further testing to provide a true picture of Plaintiff's capacities. The additional testing is not only on Plaintiff's mental state—the ostensible focus of the report—but also her physical condition. Indeed, the opinion is preoccupied with her physical symptoms. True, these physical ailments might lead to depression or other mental problems. But Dr. Imasa never makes this link. Rather, her opinion appears to distinguish the physical from the mental, advocating for "clearance with regard to her physical condition" *and* "follow-up

43

with her mental state." (R. 7, PageID.418.) And the psychiatrist seemed determined to diagnose those separate physical conditions. Though the report mentioned the recent testing from 2013 indicating that she "was basically doing very well" physically, Dr. Imasa's ultimate conclusion appears to turn instead upon her own assessment of the "documents available to this examiner," which "gave a clinical impression of closed head injury, cephalgia, cervical, lumbar and thoracic radiculitis and right knee internal derangement." (*Id.*, PageID.416.) This was, however, a psychiatric evaluation, and there is no indication that Dr. Imasa has any specialty with the physical conditions she diagnosed. *Cf.* 20 C.F.R.§ 416.927(c)(5). As for the future testing of Plaintiff's mental state, Dr. Imasa couches it in such vague terms, and with so little justification, as to make it practically meaningless: more "testing such as psychological testing would be beneficial," and she needs "follow-up with her mental state." (R. 7, PageID.418.)

What is more, when the report is read sequentially, Dr. Imasa's ending conclusion comes across like a thunderclap on a clear day. Nothing in the report prepares the reader for the thought that Plaintiff cannot "function." Her lone misstep in the testing was the inability to "recall any of the three objects," a measure of her "recent" memory. (R. 7, PageID.417.) Yet her immediate and past memory tests appear normal, her responses to questions were spontaneous, there was "[n]o pressured speech or thought blocking," she had good contact with reality, and she felt "okay" about herself, although she wished her "pain was less so that she could do the things that she used to do." (*Id.*) The entry for her "emotional reaction," part of the mental status examination, was simply her subjective complaint that she felt confused and "stuck." (*Id.*) Dr. Imasa also noted that Plaintiff did

44

not see a psychiatrist. (*Id.*, PageID.418.) Thus, it remains a mystery how or why Dr. Imasa came to believe that Plaintiff could not function.

I am also unswayed by Plaintiff's focus on two aspects of her hearing testimony. First, she asserts that she testified to cognitive difficulties, yet the only example offered is her testimony that she once almost burned down the house because she neglected to check on the food she was preparing. (*Id.*, PageID.126.) As noted above, the ALJ did not fully credit Plaintiff's subjective complaints, and no challenge has been made to that determination. Further, she gives no reason why a lone instance of forgotten cooking is so probative as to call out for remand. Second, she contends that she struggled to recall her history at the hearing. But she cites no examples to this effect, and even if she had, the Court is not equipped to diagnose cognitive impairments based on hearing transcripts. Nor, again, can it determine her credibility. *Brainard*, 889 F.2d at 681.

In addition to these problems, Plaintiff has not specified what other nonexertional restrictions should have been added to the RFC. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (the claimant bears the burden of demonstrating the need for a more restrictive RFC). She does not, for example, explain how any of her mental impairments preclude her from functioning at the level specified in the RFC. *See Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. June 27, 2013) ("Plaintiff does not specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment . . . .").

For these reasons, Plaintiff's arguments do not convince me that a reversal is necessary. Additionally, the ALJ relied on other evidence to support the decision. Most

notably, the ALJ gave great weight to Dr. Morrow's opinion, which found few mental limitations. (R. 7, PageID.60.) "In appropriate circumstances," opinions from non-examining consultants such as Dr. Morrow "may be entitled to greater weight than the opinions of treating or examining sources." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting SSR 96-6p, 1996 WL 3744180, at *3 (July 2, 1996)). Here, given the flaws in Dr. Imasa's examining opinion, it was appropriate for the ALJ to accord Dr. Morrow's opinion greater weight.

Also, the ALJ correctly observed that aside from a prescription for antidepressants from her physician, Plaintiff had not had any treatment for mental health conditions. (R. 7, PageID.59.) While the failure to seek treatment for mental health issues is not highly probative, as the psychiatric problems might contribute to the treatment gaps, it nonetheless can bolster an ALJ's decision to deny benefits. *See Nace v. Comm'r of Soc. Sec.*, No. 13-12770, 2015 WL 1511055, at *29 (E.D. Mich. Mar. 25, 2015) (citing caselaw). Here, there is no indication that the lack of treatment resulted from the conditions themselves, and in any event the ALJ did not unduly rely on this factor. And no other objective evidence indicated severe mental impairments or limitations.

In sum, substantial evidence supports the ALJ's conclusion regarding Plaintiff's mental impairments.

### G.  Conclusion

For these reasons, I conclude that substantial evidence supports the Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (Doc. 11),

**GRANTING** the Commissioner's Motion, (Doc. 12), and **AFFIRMING** the Commissioner's decision.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 19, 2019                                    S/ PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 19, 2019                                    By s/Kristen Castaneda
                                                        Case Manager